# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

_____

In re:

Levi Marvin Power and
Sherri Ann Power,

       Debtors.

Bankruptcy Case
No. 16-40636-JDP

_____

Gary L. Rainsdon,
 Trustee,

       Plaintiff,

vs.

America First Federal Credit
Union,

       Defendant.

Adv. Proceeding
No. 16-08034-JDP

_____

## MEMORANDUM OF DECISION
_____

Appearances:

Heidi Buck-Morrison, Pocatello, Idaho, Attorney for Plaintiff.

Darwin Bingham, Salt Lake City, Utah, Attorney for Defendant.

MEMORANDUM OF DECISION – 1

*Introduction*

This action highlights some of the administrative and logistical

challenges  arising when a lender engages in a remote transaction with

borrowers residing in a different state.   As will be seen, those challenges

are potentially heightened when the borrowers seek bankruptcy relief

shortly after the transaction occurs.  Because the prospect of a bankruptcy

filing is always present, the lender must adjust its policies and protocols

accordingly or suffer the consequences.

On November 23, 2016, Plaintiff, chapter 7[1] trustee Gary L. Rainsdon

("Trustee"), commenced this adversary proceeding seeking to avoid the

transfer of a security interest by Levi Marvin and Sherri Ann Power

("Debtors") to Defendant America First Federal Credit Union

("Defendant"). Dkt. No. 1.  The parties filed competing Motions for

Summary Judgment.  Dkt. Nos. 19, 28.  The Court granted partial

---

[1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all Rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

MEMORANDUM OF DECISION – 2

summary judgment in favor of Trustee adjudging that, under § 547(b), the

transfer of the security interest to Defendant was indeed a preference.

Order at 2, Dkt. No. 40.  However, the Court concluded that genuine

issues of material fact remained, and that a trial was necessary to

determine whether Debtors' transfer of the security interest to Defendant

was excepted from avoidance under § 547(c)(1).  *Id.*

The parties filed pretrial briefs, Dkt. Nos. 55, 57, and on February 26,

2018, the trial was conducted, at which the parties presented evidence and

testimony.  Dkt. No. 58.  Thereafter, they submitted closing briefs.  Dkt.

Nos. 61, 64.  Then, on April 13, 2018, the parties provided their oral

arguments via a telephonic hearing.[2]  Dkt. No. 66.  Having considered the

evidence and the parties' arguments, as well as the applicable law, this

Memorandum sets forth the Court's fact findings, legal conclusions, and

reasons for its decision.  Rules 7052; 9014.

---

[2] Defendant's attorney suggested that both written and oral closing arguments were appropriate.  While perhaps unusual, because the Court prefers to defer to counsel on matters concerning how they can best represent their clients, the Court granted this request.

MEMORANDUM OF DECISION – 3

*Facts*

In April 2016, Debtors decided to refinance the purchase money loan on their 2015 Chrysler Town & Country ("the Vehicle"). Sherri[3] testified that while Debtors had originally financed the Vehicle through the dealership to take advantage of an incentive program, they wanted to refinance at a better interest rate. Tr. at 10:13–21, Dkt. No. 61.[4] Debtors chose Defendant for the refinance loan because it offered "a much better interest rate" and Debtors had "worked with them before and really liked to work with them." Tr. at 10:17-21.

The entire refinancing process was conducted on the phone or through email because Defendant's office was in Utah[5] while Debtors lived

---

[3] Debtors' first names are used for clarity. No disrespect is intended.

[4] Sherri testified at trial that she handled most of the details and engaged in the discussions with Defendant's representatives concerning the refinancing. Tr. at 10:22–25.

[5] Defendant's primary office and administrative operations, including its records department, are located in Riverdale, Utah. Tr. at 79:1–2. However, Defendant does business in several different states, and maintains offices in Arizona and Nevada as well. Tr. at 81:4–5. However, Defendant had no office in Idaho at the time Debtors were refinancing. Tr. at 80:22–81:19.

MEMORANDUM OF DECISION – 4

in Oakley, Idaho.  Tr. at 22:7–14.   It was agreed that Debtors would

borrow an amount sufficient to pay off the existing loan on the Vehicle

from Defendant, and would grant Defendant a security interest in the

Vehicle to secure their repayment of the loan.  The interest rate on the new

loan was lower than the rate on the existing loan.

On April 11, 2016, Leeanne Adams ("Adams"), a representative of

Defendant,[6] emailed Debtors soliciting information needed to close the

new loan.  Ex. 106 at 1.   In that email, Adams noted that she had attached

an Idaho title application for the Vehicle ("the First Title Application"),

which she requested that Debtors sign and return by mail to Defendant.

Ex. 106 at 1.  In an email later that same day, after Adams had confirmed

the Vehicle was registered in Idaho, she wrote to Debtors:

> Perfect. I just wanted to make sure I was sending you the
> correct title application.  We just need to fill out the Idaho
> Title Application to change the lienholder information, so that
> [Defendant] becomes the new lienholder on the title.  I hope
> that makes sense.

---

[6] Adams worked at Defendant's Hill Air Force Base [Utah] Community
Branch office.  Tr. at 72:5–6.  *See also* Ex. 106.

MEMORANDUM OF DECISION – 5

Ex. 106 at 3.

A couple of hours later, Sherri replied to Adams by email with the information: "I think this is what you need, we will fill out the change of lien and get that mailed to you also." Ex. 106 at 3. The emails in the record do not contain, and Sherri could not recall receiving, a deadline to return the First Title Application. Ex. 106; Tr. at 25:18–16:15. Defendant does not usually give borrowers a deadline to return completed title applications. Tr. at 62:19–21.

On April 13, 2016, Debtors electronically signed a fully completed Loan and Security Agreement and Disclosure Statement ("the Note"), which had been provided to them by Defendant. Ex. 101. The Note documented the refinance loan terms, and granted Defendant a security interest in the Vehicle. Ex. 101 at 1. Sherri testified that she and her husband intended to assist Defendant with whatever details or tasks needed to perfect the security interest on the Vehicle as quickly as possible. Tr. at 11:6–18. That same day, based upon Debtors' execution of the Note, Defendant mailed a cashiers check and a letter to Debtors' previous lender;

MEMORANDUM OF DECISION – 6

the letter requested that the prior lender pay off the prior loan and release

the existing security interest in the Vehicle.  Ex. 100.  Defendant's check to

the prior lender "cleared" on April 19th, 2016.  Tr. at 33:3.

On April 14, 2016, Debtors completed by hand and signed the First

Title Application.  Tr. at 12:5–6; Ex. 102.  However, in doing so, Sherri

mistakenly listed the name of the prior lender in the space for the

"Primary Lienholder" in the First Title Application rather than Defendant.

Ex. 102.  Sherri had not asked Adams for instructions about how to fill out

the First Title Application and presumably believed she had correctly

filled out this form.  Tr. at 12:7–23.  In inserting the incorrect information,

she believed the First Title Application was asking her to identify her prior

lender, who held a lien on the Vehicle at that time.  Tr. at 12:7–23.

Importantly, Karalyn Hill ("Hill"),[7] testified at trial that, ordinarily,

---

[7] Hill had little, if any, significant personal knowledge about Defendant's
transaction with Debtors.  Hill has been employed by Defendant for over 10
years.  She has held the positions of consumer loan collector, an overdraft
collector, and a bankruptcy specialist. Tr. at 29:17–31:20.  She is currently
Defendant's loss mitigation coordinator; she oversees nine bankruptcy specialists
and makes supervisory decisions about "bankrupt" accounts.  *Id.*  To prepare for
her testimony, she reviewed Defendant's records regarding its transactions with
Debtors.  *Id.*  She has never been involved in obtaining or perfecting Defendant's

MEMORANDUM OF DECISION – 7

Defendant's employee would insert the correct information on a title

application before asking a borrower to sign it.  Tr. at 33:23–34:3; Tr.

46:24–25; Tr. 49:5–10.  Hill testified that this is the preferred practice

because Defendant has experience and is usually better-informed about

what information is necessary to properly complete an application.  Tr.

49:7–8; 51:6–8.

The precise date that Debtors mailed the signed First Title

Application to Defendant is unclear from the record.  In an email dated

April 20, 2016, Sherri asked Adams for the address to which she should

mail the First Title Application.  Ex. 106 at 8.  The next day, Adams

responded "Sorry I did not work yesterday"[8] and instructed Sherri to send

the form to Defendant's records department.  Ex. 106 at 8.  At trial, Sherri

---

security interests in title vehicles.  Tr. at 54:3–5.  However, she learned about
Defendant's process of taking and perfecting liens from one of Defendant's title
suspense officers in Defendant's records department.  Tr. at 54:13–20.  While, to
the Court, it seems Defendant's other employees might have more insight into
and knowledge of the relevant facts in this case, Hill was designated by
Defendant to testify about Defendant's records and information concerning this
matter.  Tr. at 31:4–8.

[8]  In an April 13 email to Debtors, Adams wrote that "I only work 20 hours
per week so I am sometimes hard to reach."  Ex. 106.

MEMORANDUM OF DECISION – 8

could not recall the exact date she mailed the First Title Application to

Defendant; she thought it was likely mailed the week of April 25th.[9] Tr. at

15:14–16:5.

Hill testified that it is Defendant's usual practice to record when it

receives a completed title application from a borrower.  Tr. at 52:15–19.

Despite this, for whatever reason, Defendant could produce no record of

when it received the First Title Application from Debtors, or who at its

records department received it.  Tr. at 37:17–19; 52:15–19.

Hill also testified that it is Defendant's normal and recommended

practice to also note in its records when a borrower's completed title

application is reviewed by its staff, and whether any errors are identified.

Tr. at 53:13–17.  But again, that was not done here.  Tr.  53:16–19.  Because

of this, Hill did not know when Defendant's agents first became aware of

the error in the First Title Application.  Tr. at 54:9–18.

Hill gave conflicting testimony concerning how Defendant learned

---

[9]  Sherri testified that Debtors lived in a rural area, and Debtors had to
drive into a nearby town to mail the First Title Application.  She testified the
earliest date she would have been able to do that was April 25, 2016.

MEMORANDUM OF DECISION – 9

of the error.  During her deposition testimony, she stated Defendant

learned of the error when it received the certificate of title to the Vehicle

with no lienholder information.  Tr. at 57:22–23.  But at trial, Hill testified

that she assumed Defendant discovered the error through an employee's

review of the First Title Application.  Tr. at 54:16–18.  Hill explained she

changed her opinion after learning when Sherri returned the application to

Defendant.  Tr. at 58:10–16.  But again, because there was no indication in

Defendant's records concerning the date the First Title Application was

received by Defendant, or whether it was reviewed by staff, Hill could not

be sure that it was reviewed.  Tr. 59:17–19.

Hill explained that Defendant could not have filed the signed First

Title Application with the Idaho Transportation Department until the prior

lender released its lien.  Tr. at 38:22–25.  If Defendant had submitted an

application for issuance of a new title certificate prior to that time, Hill

assumed Defendant's application would have been rejected.

The Idaho Transportation Department noted that the former lender

had released its lien on the Vehicle on April 28, 2016.  Tr. at 39:1–4.

MEMORANDUM OF DECISION – 10

Defendant received a "clean" certificate of title for the Vehicle (*i.e.* showing no lienholder) on May 2, 2016. Tr. at 39:1–4. Apparently, by that time, Defendant was aware of the error on the First Title Application because that same day, an employee of Defendant prepared a new, second title application ("the Second Title Application") containing the correct lienholder information and mailed it to Debtors. Tr. at 38:18–21. Hill explained that Defendant typically sends title applications to borrowers via regular mail; however, Defendant's records do not indicate how the Second Title Application was sent to Debtors. Tr. 61:4–17.

Sherri testified she was not aware of the error on the First Title Application until she received the Second Title Application from Defendant.[10] Interestingly, she could not recall when she received it, or how, or whether any instructions or correspondence accompanied it. Tr.

---

[10] After receiving the Second Title Application from Defendant, Sherri testified that she was still not fully aware of the error she had made in filling out the First Title Application. She testified that the information in the blanks of the Second Title Application had already been completed by Defendant, and because she no longer had access to the First Title Application, she could not understand what was different or why Debtors needed to sign the Second Title Application. Tr. at 23:21–25.

MEMORANDUM OF DECISION – 11

24:20–25:13.  Sherri could also not remember whether Defendant set any

deadline for Debtors to sign and return the Second Title Application.  Tr.

at 26:16–19.

While it seems odd to the Court, Hill testified she did not believe

any written instructions were mailed to Defendants along with the Second

Title Application.  Tr. at 61:18–19.  She also did not believe that Defendant

contacted Debtors by phone or email to instruct them on how to complete

or return the Second Title Application.  Tr. at 61:21–24.  Though Hill

testified that Defendant generally provides borrowers a prepaid envelope

to return a title application via regular mail, she did not know if that

occurred in this case.  Tr. at 62:6–14.

Debtors signed the Second Title Application on May 9, 2016.  Ex.

103.  Sherri could not recall the exact date that Debtors mailed it back to

Defendant, but thought it was "probably within a day or two of [signing

it.]"  Tr. at 17:9–11.  Defendant's records indicate it received the Second

Title Application on May 12, 2016, or in other words, 29 days after the date

the Note was executed.  Tr. at 40:3–4; Tr. at 65:25–66:3.

MEMORANDUM OF DECISION – 12

On May 18, 2016, Defendant's records department requested a check from the accounting department to pay the title processing fee.  Tr. 69:18–20.  The check was issued by the accounting department on May 20, 2016, Ex. 108, and that same day, Defendant sent the completed Second Title Application to the Jerome County Assessor, the Idaho Transportation Department's agent.  Addressing the eight-day delay in doing so, Hill explained:

> Since we don't do a lot of business outside of Utah we typically wait a couple of days to see if there's any other accounts that are along with that same state that we need to request a title on or be added on [as] lienholder[.]

Tr. at 40:8–11.  The Second Title Application was sent via FedEx certified three-day mail.  Ex. 105 at 44; Tr. at 68:12, 21–23.  The date that the Jerome County Assessor received the Second Title Application is not established in the record.  However, the Vehicle's title indicates that Defendant's lien was "recorded" on  June 1, 2016.  Ex. 107; Ex. 104 at 1–2.

When asked about whether the process to perfect its lien in this transaction could have been expedited, Hill acknowledged that the

MEMORANDUM OF DECISION – 13

accounting department could have issued a processing fee check the same

day it was asked to do so.  Tr. at 66:19–22.  She opined that hand-delivery

of the Second Title Application to Jerome County was not realistic given

the distance between Defendant's Utah offices and the Jerome County

Assessor's office.  Tr. at 67:24–25.

Debtors filed a chapter 7 bankruptcy petition on July 18, 2016.

### *Analysis and Disposition*

As noted above, the Court previously granted Trustee's motion for

summary judgment determining that the transfer of the security interest

from Debtors to Defendant is a preference under § 547(b).  Even so,

Defendant argues that the transfer of the security interest is immune from

recovery by Trustee under § 547(c)(1) as a substantially contemporaneous

exchange.  As might be expected, Trustee disagrees, arguing that the

significant delay in perfection of Defendant's security interest that

occurred in this case renders the lien transfer avoidable.

The Code provides in § 547(c)(1) that a trustee may not avoid a

transfer, even if it meets the requirements of § 547(b), if that transfer was

MEMORANDUM OF DECISION – 14

"(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange[.]" As the party asserting the contemporaneous exchange defense, Defendant bears the burden of proving that "1) the parties intended the transfer of new value to be contemporaneous, 2) the exchange was in fact substantially contemporaneous, and 3) new value was given." *Janas v. Marco Crane & Rigging Co. (In re JWJ Contracting Co., Inc.)*, 287 B.R. 501, 510 (9th Cir. 2002) (citing *Dye v. Rivera (In re Marino)*, 193 B.R. 907, 913 (9th Cir. BAP 1996), *aff'd*, 117 F.3d 1425 (9th Cir. 1997)); *Rainsdon v. Farson (In re Farson)*, 387 B.R. 784, 795 (Bankr. D. Idaho 2008) (holding that once the requirements of § 547(b) are established the burden shifts to the transferee to show that a § 547(c) exception to avoidance applies); *see also* § 547(g) (providing that "the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section."). The Court must therefore consider whether Defendant has proven each of the elements of the

MEMORANDUM OF DECISION – 15

§ 547(c)(1) preference defense.

## A.    New Value

Defendant has shown, without dispute, that it provided new value to Debtors in connection with the refinance loan.  In exchange for their grant of the security interest in the Vehicle, Defendant loaned Debtors the funds to pay off the debt to the prior lender, and in the process, afforded better financing terms to Debtors than under the existing loan.

## B.    The Parties' Intent

Both Debtors and Defendant intended the exchange of the security interest for the loan to be contemporaneous.

Debtors executed the Note on April 13, 2016, in which Defendant agreed to make Debtors the refinance loan, and Debtors granted a security interest to Defendant in the Vehicle to secure repayment of that loan. Sherri testified that Debtors intended to take whatever steps were necessary to assist Defendant in perfecting its security interest in the Vehicle, and to do so as quickly as possible.  That same day, Defendant mailed the loan proceeds via cashier's check to the prior lender.

MEMORANDUM OF DECISION – 16

Defendant contemporaneously provided the First Title Application to

Debtors for completion, which when filed with the Idaho Department of

Transportation would allow Defendant to perfect the security interest.

Hill testified, "[Defendant] definitely wanted to get it process in a timely

manner to perfect [its] lien on the vehicle."  Tr. at 41 7–10.

Debtors' attempts to cooperate with Defendant, and Defendant's

initial steps to perfect its security interest in the Vehicle, evidence the

parties' intent to contemporaneously complete the transaction.  Moreover,

Trustee acknowledges that there is no evidence to rebut Ms. Hill's

testimony that Defendant intended for the transfer to be a

contemporaneous exchange for new value. Tr.'s Br. at 3, Dkt. No. 64.

Therefore, on this record, the Court concludes that Defendant has satisfied

this element of the defense.

## C.    In Fact Substantially Contemporaneous

There is no question that the Note was executed by Debtors, and

that the loan proceeds were sent by Defendant to the prior lender, on April

13, 2016.  Based upon the evidence, the Court finds that Defendant's

MEMORANDUM OF DECISION – 17

security interest in the Vehicle was perfected, and therefore the lien transfer effectively occurred in this case, no earlier than May 23, 2018. Was this exchange "in fact substantially contemporaneous" for purposes of § 547(c)(1)(B)?

### 1.    When the Security Interest was Transferred

Apparently recognizing creditors can not always be expected to quickly perfect liens and security interests, the Code provides lien creditors with a limited "safe harbor" against a preference attack. It does so by providing that, solely for the purposes of determining whether a transfer is an avoidable preference, the transfer of a security interest to a creditor in a debtor's property is deemed to have been made "at the time such transfer takes effect between the transferor and the transferee, *if such transfer is perfected at, or within 30 days after, such time . . . .*" § 547(e)(2)(A) (emphasis added). However, if a lien transfer is not perfected within 30 days, it is deemed to have been made "at the time such transfer is perfected." § 547(e)(2)(B).

The parties agree that, under Idaho law, Defendant's security

MEMORANDUM OF DECISION – 18

interest in the Vehicle was perfected on the date the Jerome County

Assessor received the properly completed Second Title Application.  Idaho

Code § 49-510(2) ("A lien is perfected as of the date of the filing of a

properly completed application with the department or an agent of the

department."); *In re Conklin*, 511 B.R. at 695.  Defendant sent the Second

Title Application to Jerome County on May 20, 2016 via FedEx three-day

certified mail.  Thus, in the absence of other credible evidence, the Court

finds that the earliest Defendant's security interest could have been

perfected was May 23.  This date is 40 days after Debtors' execution of the

Note.  Simply put, then, for preference purposes, because Defendant's

security interest was not perfected within 30 days from the time the Note

was executed (*i.e.*, the date the Note "was effective" between the parties),

Debtors are deemed to have transferred the security interest to Defendant

in the Vehicle when it was perfected, May 23.  As a result of this finding,

Defendant can not take advantage of the 30-day "safe harbor" protections

of § 547(e)(2)(A).

     **2.**    **A Flexible Standard**

MEMORANDUM OF DECISION – 19

That Defendant does not qualify for the 30-day preference "safe harbor" does not necessarily mean that the § 547(c)(1) avoidance exception is inapplicable in this case.   As noted in the case law, § 547(c)(1)(b) requires only that an exchange be "*substantiall*y contemporaneous".  And the Code allows for a flexible approach in determining whether the timing of the exchange involving the transfer is in fact substantially contemporaneous. *In re Marino*, 193 B.R. at 916 (explaining that "[i]nstead of applying the strict ten-day [now 30-day] limit enumerated in § 547(e)(2), an inquiry into the facts and circumstances of the particular transaction should be made to determine whether a transfer was substantially contemporaneous in fact."). In applying this flexible approach, a court should "look to the facts and circumstances of the case and determine whether the delay in perfection was reasonable . . . [and] when the delayed perfection of a security interest can be satisfactorily explained, the transfer may still be characterized as substantially contemporaneous in fact." *Id.* at 915.  In *In re Marino*, the BAP affirmed the bankruptcy court's determination that, despite the 14-day delay in perfecting it, the transfer of the security interest was

MEMORANDUM OF DECISION – 20

substantially contemporaneous in fact. *In re Marino*, 193 B.R. at 916. In

doing so, the BAP explained:

> While the bankruptcy court made no specific findings that
> explain the delay in recordation, factors that are particularly
> compelling in this panel's examination of the issue include
> that the parties clearly intended that the transfer be
> contemporaneous and that the 14-day delay was not
> significantly more than the ten-day window provided in
> § 547(e)(2). Unforseen circumstances not attributable to [the
> lender] include the apparent delay by Gateway Title Company
> in closing the escrow and recording the Orange County deed
> of trust and the complete failure to record the Riverside
> County deed of trust. Finally, that [the lender] was neither
> dilatory nor negligent in his actions is significant.

*Id.*

As the Code's language reflects, whether a transfer is in fact

substantially contemporaneous is a question of fact to be determined based

upon the relevant circumstances of each case. *In re Marino*, 193 B.R. at 911

(citing *In re Lewellyn & Co., Inc.*, 929 F.2d 424, 427 (8th Cir.1991)); *Stahl v.*

*Whelan Electric, Inc. (In re Modtech Holdings, Inc.)*, 503 B.R. 737, 746 (Bankr.

C.D. Cal. 2013) (citing *In re Marino*, 193 B.R. at 913–14).

### a.      The Parties' Intent and Length of Delay

MEMORANDUM OF DECISION – 21

As the Court previously explained, the parties intended that the Debtors' grant of the security interest in the Vehicle to Defendant be contemporaneous with Defendant's loan to them. However, the Court finds that there was a 40-day delay by Defendant in perfecting the security interest. This was a significant delay, in the Court's view. Therefore, the parties' intent is not alone dispositive in deciding whether the transfer was in fact substantially contemporaneous for purposes of § 547(c)(1). Other relevant circumstances must therefore be considered.

### b.   Unforseen Circumstances Not Attributable to Defendant

Did "unforseen circumstances" not attributable to Defendant prevent the timely perfection of the security interest? In the Court's opinion, perhaps Sherri's error in completing the First Title Application arguably falls into this category. But Sherri's mistake alone does not account for the length in the delay of Defendant's lien perfection. Moreover, that a borrower would perhaps make an error in completing a blank title application  necessary to perfect the security interest can not be

MEMORANDUM OF DECISION – 22

said to be entirely unforseen in this case.  Hill admitted that it was

Defendant's usual practice to complete title applications for borrowers to

the extent the information was known because Defendant was experienced

in completing the forms and was is in a better position to do so correctly.

The existence of this practice  evidenced that Defendant was aware that

borrowers may make mistakes in completing title applications.

Furthermore, Sherri's error in the First Title Application was, at least

partially, attributable to Defendant.  In addition to failing to adhere to its

own practices by sending Debtors an application that already included the

proper "new lienholder" information, the record shows that Defendant

failed to provide Debtors with adequate instructions on how to complete

the First Title Application themselves.  No real directions were included in

the emails in the record, nor could Sherri recall receiving instructions from

Defendant.  Defendant argues that "Sherri was specifically instructed to list

[Defendant] as the new lienholder in the title application."  Def.'s Br. at 7,

Dkt. No. 61.  But, more precisely, Adams's email to Sherri about the title

application indicated only that its purpose was "so that [Defendant]

MEMORANDUM OF DECISION – 23

becomes the new lienholder on the title." Given the generality of this

"instruction," Sherri, who had no prior experience completing title forms,

can not legitimately be criticized for her decision to insert the name of the

prior lender in the First Title Application in the box labeled "Primary

Lienholder Name." All things considered, Defendant has not shown that

Debtors' error in completing the First Title Application was an unforeseen

circumstance not attributable to Defendant.

Defendant also argues that Debtors' delay in returning the First Title

Application to Defendant, and the time that passed before it received

notice that the prior lender had released its lien, were unforeseen

circumstances contributing to the delay in perfecting Defendant's security

interest for which it is not accountable. The Court also disagrees with this

argument.

That it would take some time for Defendant to receive notice that

the prior lender had released its lien on the title to the Vehicle was not an

unforeseeable circumstance. Defendant understood it was dealing with an

Idaho lender and elected to transact the payoff of the prior loan by mail. In

MEMORANDUM OF DECISION – 24

doing so, Defendant could be sure that there would be a delay in getting a
"clear title" to the Vehicle; only the extent of the delay was arguably
uncertain.

As for Debtors' delay in returning the signed First Title Application,
here, too, Defendant should have reasonably expected there could be some
delay.  And that the delay in this case was perhaps longer than usual was
partially attributable to Defendant, because it failed to give Debtors a
deadline to return the First Title Application, and then failed to follow up
with Debtors when the completed paperwork did not arrive promptly.

Based on this record, the Court finds that the circumstances giving
rise to the delay in perfecting Defendant's security interest were not all
unforeseen, and those circumstances were at least in part attributable to
Defendant.[11]

---

[11] Defendant argues that Debtors' bankruptcy filing was another
unforseen circumstance, and that had Defendant been aware of their intentions
to seek such relief, Defendant would never have made the loan to Debtors.  But
this argument carries no weight in this context.  The Court presumes few
creditors would make loans to debtors if they were aware a bankruptcy filing
was imminent.  Since, by definition, there can no preference without a
bankruptcy filing, Debtors' decision in this case to file for bankruptcy is not the
sort of unforseen circumstance that the Court should consider in making its

MEMORANDUM OF DECISION – 25

### c.  Defendant's Dilatory Actions

The case law suggests that the Court should also consider whether

Defendant was dilatory in perfecting its security interest in this analysis.

On this record, the Court comfortably finds that Defendant was indeed

dilatory, if not negligent, in protecting its rights in the Vehicle.  In the

Court's opinion, the 30-day window provided by § 547(e)(2) offered

Defendant ample opportunity to perfect its security interest in this case.  Of

course, to do so, Defendant should not have relied solely on Debtors to

correctly complete the First Title Application; should have provided

Debtors with better instructions on how to do so; should have established a

deadline for Debtors to return the completed First Title Application;

should have contacted Debtors when the completed First Title Application

was not received promptly; and should have promptly reviewed and

detected the error in the completed First Title Application when it was

received.

Furthermore, once the First Title Application was received by

---

decision about the applicability of the § 547(c)(1) defense in this action.

MEMORANDUM OF DECISION – 26

Defendant and the mistake in its completion finally identified, Defendant

could have taken extraordinary steps to ensure that a corrected application

was generated, executed and filed within the 30-day preference safe

harbor.  Instead, when the Second Title Application was received from

Debtors,[12] Defendant sat on it for eight additional days in accord with its

practice to hold documents to see if other documents could be sent in a

batch to the same location.[13]   This decision was unjustified under these

facts.

_____

[12]  The evidence shows the executed Second Title Application was
received by Defendant with one day remaining on the § 547(e)(2) 30-day safe
harbor.  While it would likely have required use of an overnight courier service,
it presumably would have been possible for Defendant to deliver it to Jerome
County the next day and thereby avoid any preference concerns.  While the
Court appreciates the administrative burden and expense associated with such
an effort to perfect its lien, Defendant must understand that, by waiting, it
assumed the risk of losings its lien to protect its approximately $22,400 loan to
Debtors.  Ex. 101 at 1.

[13]  Frankly, Defendant's explanation for the additional delay in sending
the completed Second Title Application to Jerome County for filing is less than
credible on this record.  The Court is skeptical that a Utah credit union doing
limited amounts of business in Idaho would have a "batch" of title applications
to mail to Idaho authorities, especially to Jerome County, for filing.  As a fact-
finder, the Court therefore doubts that Defendant waited eight days to send the
Second Title Application to Jerome County for this reason.

MEMORANDUM OF DECISION – 27

In sum, the cavalier approach Defendant took to perfecting its

security interest was dilatory.  Had different methods and decisions been

made, Defendant could easily have perfected its security interest in the

Vehicle within 30 days of making the loan, and thereby have been immune

from Trustee's preference claim.  While Debtors conduct partially

contributed to the delay, so did Defendant's lack of urgency and prudence

in dealing with that delay under the circumstances.

### 3.      Defendant's Other Arguments

Defendant's reliance on the Delaware bankruptcy court's decision in

*In re J Silver Clothing, Inc.,*  453 B.R. 518 (Bankr. D. Del. 2011), deserves

mention.  In that case, the bankruptcy court found that, under the 10-day

perfection window provided in the former § 547(e)(2), a 28-day delay by a

creditor in perfecting a lien was in fact a substantially contemporaneous

exchange, because:

> (1) the parties intended for the transfer to be
> contemporaneous;
> (2) the delay in perfection was caused by inadvertent error
> and was not purposeful;
> (3) the prompt initial submission of the UCC-1 and the prompt

MEMORANDUM OF DECISION – 28

submission of a corrected UCC-1 following receipt of the
rejected statement demonstrated intent to immediately perfect
the security interest and no lack of concern by the parties to
perfect the lien; and
(4) no prejudice to third parties from the delayed perfection.

453 B.R. at 530–31. Based upon this decision, Defendant argues that the

transactions in this case were also substantially contemporaneous in fact

because Debtors' error in completing the First Title Application that caused

the delay was inadvertent and not purposeful, and because the evidence

does not otherwise indicate a lack of concern on Defendant's part to perfect

its security interest. Def.'s Br. at 13.

   *In re J Silver Clothing, Inc.* is of little help to Defendant in this case.

Whether lien perfection was "in fact" substantially contemporaneous with

the grant of the security interest is, as the Code instructs, a separate and

additional requirement from what the parties intended, and a purely

factual determination based upon the circumstances each case. Thus, that

a 28-day perfection delay is found in one bankruptcy case to be in fact

substantially contemporaneous is of no particular moment in another

where the relevant facts, and the fact-finder, are different. Here, for

MEMORANDUM OF DECISION – 29

example, the Court has found that it took Defendant at least 40 days, not 28 days, to achieve perfection.

In addition, as *In re Marino* explains, the parties' delay in perfection of the lien need not be purposeful – it is sufficient if it resulted from the creditor's dilatory or negligent conduct.  193 B.R. at 916.  And here, as the Court has explained, the evidence shows Defendant was dilatory in failing to take necessary steps to promptly complete and file the lien perfection documents.

Defendant further argues that the fact that no third party was prejudiced in this case should weigh in its favor.  Def.'s Br. at 12 (citing *In re J Silver Clothing*, 453 B.R. at 531).  The Court disagrees.  While prejudice to a third party from Defendant's conduct might impair its position, the absence of prejudice to others does not necessarily weigh in its favor.  Put another way, an absence of prejudice resulting from Defendant's perfection delays does not preclude a finding that Defendant's actions were dilatory and unreasonable under the circumstances.[14]

---

[14]  Moreover, Defendant's "no harm - no foul" argument contravenes the legislative policies of the Bankruptcy Code.  Congress has seen fit to proclaim

MEMORANDUM OF DECISION – 30

Defendant also argues that it deserves a pass in this case because it is "a sizeable financial institution that processes many, many loans", Def.'s Br. at 9, and that it should be expected that, sometimes, mistakes will be made.  Of course, the record contains little proof that Defendant's lending operation is indeed "sizeable", nor whether, in evaluating its argument, the Court should compare it to national banks or the smallest consumer lenders in this region.  But Defendant's "size" is of no concern, because the same Idaho lien perfection rules apply without exception to all lenders, big and small.  Moreover, assuming it indeed makes many secured car loans, the Court would expect Defendant to adopt, and to follow, sound processes that promote the prompt perfection of its liens.  As can be seen in this case, in this age of electronic transactions, that Defendant apparently elects to rely upon unsophisticated borrowers to complete required legal

---

that certain transfers, § 547(b) preferences, that are otherwise legitimate and unrecoverable under nonbankruptcy law, are to be avoided in bankruptcy cases. In so doing, Congress has inherently decided that the equities weigh in favor of a debtor's unsecured creditors over those receiving preferences, including those who delay in perfecting liens, without proof of actual prejudice.  Given the policy expressed in the Code, the Court should be extremely reluctant to act to "adjust" the outcome based on equitable considerations.

MEMORANDUM OF DECISION – 31

forms, and upon "snail mail" to send and receive payments and

documents needed to perfect a security interest is a business decision

fraught with risk where bankruptcy trustees lurk.

### *Conclusion*

The Court finds that the exchange in this case was not in fact

substantially contemporaneous for purposes of § 547(c)(1).  Therefore, the

transfer of the security interest in the Vehicle from Debtors to Defendant is

not excepted from avoidance as a preference under § 547(c)(1).  This

finding, in tandem with the Court's prior determination that the transfer of

the security interest was a preference under § 547(b) renders that transfer

avoidable by Trustee.

The parties shall cooperate in the prompt submission of an

appropriate form of judgment for entry by the Court.

Dated:  April 18, 2018

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 32